Case number 23-1631, United States v. Kenneth Gianatasio. At this time, if counsel would be compelled to please introduce herself on the record. Untethered by the guidelines, the court was then faced with the decision of how to impose a sentence that on counts 1 could have been anywhere between 5 and 20 years, and on counts 2 and 3 could have been anywhere between 0 and 20 years. The court had to confront the problem of how to pick a sentence within this broad range. The result here was a substantively unreasonable sentence. Without the guidelines, the court turned to uncontextualized nationwide sentencing data. It treated this mean and median sentence that came out of the Jason sentence as sort of a proxy for the guidelines. This court and others have long recognized that uncontextualized sentencing data has limited power and is only relevant insofar as the comparison is an apples-to-apples comparison. So if you look at cases like Joubert, Mateo Espejo, Reyes-Santiago, I also cited Tenth Circuit and Fifth Circuit cases in my brief, the courts are discussing the fact that when you see data, you don't know anything underlying it. You don't know why that person may have received. Let me ask, wasn't it the defense that initially brought up the data issue, as the government suggests in its brief? No, Your Honor. The court sort of gives some preliminary discussion about sentencing, and the court mentions this Jason data. And what Mr. Giontasio does in response is he – because Mr. Giontasio is asking for about 72 months, asking for 72 months, and the Jason mean and median are around 140. And in his sentencing argument, Mr. Giontasio's counsel says, I understand that you in court have referenced Jason, and that's too high, and then continues on with the explanation for why 72 months is an appropriate sentence. Mr. Giontasio is not leveraging the Jason data as support for a 72-month sentence. That does not happen. Mr. Masso, couldn't – the judge could have decided to go with the guidelines, and that would not be reversible error to stay with the guidelines. The judge here put aside the guidelines, not because he thought they were insufficiently lenient, but because he thought they were too strict, too severe a sentence. That's a very good thing for a defender in that situation. He then turned to data, which like most data was not perfect, but wasn't it much better for your client that he found that data informative than he opted instead to go with the guidelines? That is true. However, data still has these predictable limitations, and you can see when you look at the Jason data in the PSR, which is at sealed appendix 18. It shows that some of the individuals whose sentences are contained in that data set received within guideline sentences. So it's immediately evident that there are people who are in that bunch who are in a different category, where the judge did not decide to disregard the guidelines. And if you – we've – you know, we presented multiple ways to sort of think about – I mean, so the court looked at the data, but the record suggests that the court gave an individual assessment of the facts of this case in formulating an eventual sentencing determination. I think that the court's reliance on this data without recognizing these very predictable limitations of it – What makes you think the court didn't understand that? Because the court does not – it doesn't make any discussion of, you know, I can see that there's some within guideline sentences, there's some above guideline sentences. That's not discussed. There's sort of this continued reference back to this 104 – excuse me, 140 months, 140 months in the court. You see the court talking about, you know, I don't think this is a lower end, I don't think this is the highest. Things go up, things go down. And the court lands just sort of slightly higher than this median, suggesting that that really is a controlling moment. But I do want to say a little bit more about Judge Cayatta's question, is another piece of this case is that Mr. Giontasio suggested that one way to think about the practical impact of disregarding the guidelines is to actually go in and sort of do the deconstruction of the guidelines, right? Part of why these particular guidelines get rejected is because they include these many enhancements that really apply in all cases and therefore don't meaningfully distinguish between cases. And so one way to think about what a guideline sentence would look like without these added guidelines. Well, did you tell that to the district court? Yes. It's in the sentencing memo in detail. And the government recognizes that that argument was presented in the sentencing court, that if you subtract out these guidelines, this is what – and I have it here. So the court – But why would you subtract out the sentences that appeared to follow the guideline? Because the judge could be interested in knowing in the whole class of offenses of this type, what is someone else coming to as a mean or a median? And of course, you would consider the high end just as you would include the low end. Even though you found the high end is too high, you're similarly finding the low end is too low. Why wouldn't you be interested in the whole data set? I think that, first, I do want to keep coming back to this sort of greater point that uncontextualized data is very limited in what it means, that we don't have information about whether many of those sentences were driven by high mandatory minimums, whether there were many people who went to trial. When this court has, in many cases, looked at comparisons, they have pointed to things like prompt cooperation versus sort of more reluctant cooperation, and therefore you can't look at the comparative sentences. All of these little details matter, and none of those are evident from the JSON data. Is there any suggestion that the judge thought that the data was something other than what it was? No, I don't think this is a case where there's sort of an evident misunderstanding. So then are you saying the judge was required to ignore the data? No, but I think where the judge gave, given that the judge is in this sort of open field of sentencing, where there's sort of 0 to 20, essentially, or 5 to 20, that the weight that gets placed on the JSON data, and I do want to put this in sort of the bigger context that this is just one factor that contributes to a substantively unreasonable sentence. So it's sort of the way that the judge gave such controlling force to this uncontextualized data, and the piece about not considering the fact that some of those people received within guideline sentences is sort of just one sort of immediately present example of the ways that the data, there are differences between those 300 some people that are simply not reflected. And so that is one of the pieces that contributes to this substantively unreasonable sentence. So the briefing suggests that this has now become a tool that district courts are using. And so if we're writing something that we hope is instructive to the district judges and giving them guidance, what would you, ideally, would you want us to put in a decision about this data? And how should they, how should the district court judges express what they're doing relative to this data when they're undertaking a sentencing process? I think to a great extent, this court has already written about data. You know, the JSON tool itself, where you can go on the sentencing website and sort of plug in and pull out the data set, that piece is new. But the Sentencing Commission has been collecting data and making it available to judges for a long time. And there's the, you know, the cases that I mentioned before, you know, have all talked about that, have all talked about data and the way that it's really important to make sure that you're doing apples to apples and talking about why it's being used and how it's being used and what you know and what you don't know. And that all of those limitations are really critically important. And I think that this court doesn't really have to say anything new about JSON. I think the cases about data generally already are the foundation, the bedrock for like what would be said. Let me ask you one other thing. What standard of review should we apply to this JSON issue? So that's the complicated piece where we, I acknowledge that the JSON argument was not raised below, so that piece gets plain error, but the overall substantive reasonableness claim gets abusive discretion. So I just want to keep coming back to that. But let me go to the plain error. Prior when this was decided, and there's one Ninth Circuit case now, but that came after the briefing or it's, I think it's raised in one of the briefs, but the fact that there's no case law, doesn't that make it tough for you to prevail in plain error? I think there is lots of case law. Again, JSON, the fact of JSON on the website is new, but this data is not. And this court and others have written over the years much about data, its limitations and how it needs to be used and the importance of making sure that all comparisons are apples to apples. Okay. Thank you. You have two minutes remotely. Thank you, counsel. At this time, would counsel for the government please introduce himself on the record to begin? Good morning. Donald Lockhart for the government. May it please the court. The district court did not plainly err in relying on the JSON data. Title 18, 3553A6 instructs district courts to consider disparities. And this court has pointed out that that provision is concerned primarily with national level disparities in sentencing. JSON data is an attempt to capture exactly that sort of data set. It's a tool. And the judge in sentencing here said he had considered JSON data but found it not controlling, in his words. That's addendum page 41. In the statement of the reasons, the district court actually cited the JSON data as one of the factors that it was relying on to vary downward. That's at sealed appendix, page 164. Defense counsel himself, in his own argument, structured that argument in part based on the fact that the JSON data suggested a mean sentence of 130-something or 140. And he was requesting a sentence below that, 72 months. So the defense itself built the JSON framework into its own argument, just suggested that the court should vary downward more than it ultimately did. Ultimately, recall, the court varied downward five and a half years below the bottom of the guideline sentencing range. And it did so, it said, based in part on this JSON data. So this was a factor that favored the defense. It just didn't favor the defense as much as the defense would like it to have done. Would you agree, had the district judge sentenced within the guidelines, totally not varied downwards, not considered JSON data, defendant would have a much tougher case, had the judge sentenced within the actual sentencing range. Had the judge sentenced within the, could you repeat your question? Yeah. The sentencing range was 210 to 262 months. Had the district judge sentenced within that range and not varied downwards, we'd probably not be here right now, or it'd be a very uphill argument for the defense, correct? Yeah, I would say so, Your Honor. So the defense did get a windfall by virtue of a variance because the judge did consider it JSON data, correct? Exactly. That's, I think, my point, which is that the judge actually cited the JSON data as part of its decision to vary downward five and a half years below the bottom of the sentencing range. So what we have is, in essence, de facto, an argument saying the judge was doing well in varying, but should have gone down to like 70 months, as Mr. Massa mentions, correct? Right. So if we're shifting now to sort of just the general substantive reasonableness argument the defense is making, this is sort of a classic case where the district court relies on the very factors that the defense is touting in favor of a downward variance, but simply doesn't vary down to the extent the defendant wishes the court to have done. And that's just sort of an archetypal situation where we say that's not a substantively unreasonable sentence or an abuse of discretion merely because the judge didn't place the same weight on particular mitigating factors as the defense would have wished. To put a finer point on this, if we were to say that the judge erred by looking at the JSON data and then vacated the sentence and remanded it, I suppose the judge might well conclude that since I can't look at that data according to the First Circuit, I'll give a guideline sentence and he'd get a five year longer sentence than he has now. Right. So we make sort of that point in connection with prong three of the plain error test, which requires the defendant to show if there's an error here and an obvious error, that there's a reasonable probability that had the judge stripped away the JSON data from its analysis, the result would have been a lower sentence. The defendant obviously can't satisfy that burden on this record because if anything, there's a potential for a higher sentence if that JSON data is not used. And certainly there's no world in which there's any tenable suggestion that without the data, the sentence becomes lower than it already is, five and a half years below the bottom of the range. If the court has no questions, we'll rest on our brief. Okay. Thank you. Thank you, counsel. At this time, counsel, for the appellant, please reintroduce yourself on the record. You have a two minute rebuttal.  Chrissy DeMasto for Mr. Giantassio. I think it's in connection with what the government was just saying. I think it's important to really look at what the court did here. And the court starts out by rejecting the guidelines. When you look at the sort of explanation of the sentence in the Statement of Reasons on Sealed Appendix 164, the court talks about imposing a sentence outside of and below the advisory guideline system. So the first thing that the court really does is say not the guidelines. And that decision to say not the guidelines is not based on JSON. It's based on policy disagreements. It's based on sort of what this court talked about in Aquino Florenciano. It's based on what the Second Circuit talked about in Dorvey. It doesn't have anything to do with what other sentences people are receiving. And then the court goes and looks at, okay, now that I have this range, what am I doing? And it's the way that the court uses JSON data without the context, without recognizing the lack of it, that causes the problem here. And we presented other ways that the court could... Does your client understand that if we were to accept this argument, he could end up with a significantly longer sentence? I mean, have we discussed it specifically? I don't think that that is what would happen here. I think the court did definitively reject the guidelines. And then we had other arguments about other ways to consider choosing a sentence below that. But what I think Judge Gaglia is asking, is your client aware that that's a possibility? However unlikely it may be, it's still a possibility. Yes, resentencing can always... Anything can happen on resentencing. But does your client know that? I remember when I first came on the bench, Judge Lynch recessed to make sure that the attorney called the person to make sure they understood that they could get a higher sentence. He and I have spoken about the possible outcomes of what resentencing means and that everything starts again. It could be before a different judge who loves the guidelines. Okay. I would rest on my brace for the other issues. Okay. Thank you. Thank you. Thank you, counsel. That concludes argument in this case.